NUMBER 13-06-00407-CV



COURT OF APPEALS



THIRTEENTH DISTRICT OF TEXAS



CORPUS CHRISTI - EDINBURG 


 


IN THE INTEREST OF T. J. H., A CHILD
 

 


On appeal from the 343rd District Court of Bee County, Texas.


 


MEMORANDUM OPINION



Before Justices Yañez, Rodriguez, and Vela


Memorandum Opinion by Justice Yañez
 


 Appellee, the Texas Department of Family and Protective Services ("the
Department"), brought suit for termination of Mary's and Bob's parent-child-relationship
with T.J.H., the biological child of both Mary and Bob. (1) A hearing addressing the
termination of Mary's parental rights was held before the trial court--separate from any
discussion addressing the termination of Bob's parental rights. Following the hearing, the
trial court determined that Mary endangered T.J.H. under the terms of subsections
161.001(1)(D) and (E) of the Texas Family Code, (2) and it determined that termination of
Mary's parental rights was in T.J.H.'s best interest. (3) The trial court subsequently entered
an order terminating Mary's parent-child relationship with T.J.H., and this appeal followed. 
Though the trial court later entered an order terminating Bob's parental rights, this appeal
only concerns the termination of Mary's parental rights. On appeal, Mary challenges the
legal and factual sufficiency of the evidence supporting the trial court's findings in support
of termination. Mary also argues that she received ineffective assistance of counsel at the
termination hearing. For reasons set forth below, we affirm.

I. Background

 Mary is the biological mother of V.H., D.H., and T.J.H. The parental termination
order at issue, however, only concerns T.J.H. Mary's first child is a boy, V.H., whose
biological father is Tom. At the termination hearing, Mary testified that she and Tom had
shared custody of V.H., but she had not seen V.H. in four years because Tom changed
residences and moved to an unknown location with V.H. Mary's second child is a girl,
D.H., whose biological father is Joe. Mary and Joe never married. Mary had custody of
D.H. when she later married Bob in July 1998. It was with Bob that Mary had her third
child, a son, T.J.H., in February 1999.

 In May 2002, Mary, Bob, D.H., and T.J.H. were all living together. On May 26, Mary
walked into her living room and glimpsed what appeared to be inappropriate physical
contact between D.H. and Bob. Mary privately questioned D.H. about the contact later that
day, at which point D.H. made an outcry of sexual abuse. The following day, Mary
reported D.H.'s outcry to law enforcement authorities. D.H. was then interviewed by a
social worker, at which time she revealed multiple incidents of sexual abuse that Bob
committed against her. Mary subsequently separated herself and the children from Bob
and divorced him in October 2002. Furthermore, D.H.'s biological father, Joe, upon
learning of D.H.'s abuse, sought and obtained shared custody of D.H. The custody
agreement between Mary and Joe involved each party having custody of D.H. for
alternating six-month periods. In January 2003, Bob pleaded guilty to aggravated sexual
assault--stemming from his sexual abuse of D.H.--and was sentenced to fifty years'
imprisonment.

 Mary later married Harry. The appellate record does not reveal the exact date of
Mary's marriage to Harry. It is clear from the record, however, that Mary and Harry were
married prior to August 22, 2005. The record reflects that for an unspecified time prior to
this date, Mary, Harry, and T.J.H. lived together, and D.H. lived with them during Mary's
six-month-custody periods. On the morning of August 22, 2005, educators at a school
T.J.H. attended observed bruising, swelling, and red marks on T.J.H.'s body (hereinafter
referred to as "the belt incident"). While under questioning, T.J.H. stated that Harry had
hit him with a belt and belt buckle. Educators at the school contacted law enforcement
authorities. Soon thereafter, Child Protective Services (CPS) removed D.H. and T.J.H.
from Mary's home while the belt incident was under investigation. D.H. was placed in Joe's
custody pursuant to an agreed order entered into by Mary and Joe. T.J.H. was placed in
the Department's custody.

 The Department's initial family service plan for Mary and Harry sought to reunite
them with T.J.H. The Department set aside the plan, however, after Harry was indicted for
injury to a child, a charge that stemmed from the belt incident. The Department then
constructed a new family service plan which sought termination rather than reunification. 
The Department also pursued its previously filed suit against Mary and Bob, wherein the
Department sought to terminate their parental rights to T.J.H. if reunification could not be
achieved. At some point during this time, the Department validated that Harry had
committed physical abuse against T.J.H. in relation to the belt incident. On June 20, 2006,
after a two-day hearing, the trial court entered an order terminating Mary's parental rights. 
On August 3, 2006, the trial court held a hearing on the Department's suit to terminate
Bob's parental rights to T.J.H.; at the close of the hearing, the trial court entered an order
terminating Bob's rights.

II. Statement of Points

 Section 263.405 of the Texas Family Code governs an appeal of a final order
related to a child under the Department's care. (4) A party who intends to appeal a trial
court's termination order is required to timely file "a statement of the point or points on
which the party intends to appeal." (5) The statement must be filed with the trial court "[n]ot
later than the 15th day after the date the final order is signed by the trial judge." (6) On
appeal, this Court may not consider any issue that was not specifically presented to the
trial court in a timely filed statement of points. (7)

 The Department asserts that Mary did not timely file a statement of points because
(1) the trial court issued a final order when it terminated Mary's parental rights on June 20,
2006, and (2) Mary made no filings with the trial court during the fifteen days that followed. 
Mary refutes the Department's position, arguing that (1) the order terminating her parental
rights was not a final order because it did not dispose of all the parties and claims in the
Department's suit; (2) the trial court's judgment became a final order on August 3, 2006,
when the court entered an order terminating Bob's parental rights; (3) her statement of
points was filed with the trial court on July 19, 2006, when she filed a motion for new trial; (8)
and (4) because her statement of points was filed prior to the trial court's judgment
becoming final, it should be deemed filed on the date of but subsequent to the time the trial
court's judgment became final. (9)

 An order is generally considered to be interlocutory if it does not dispose of all the
parties or claims in a case. (10) In the instant case, it is undisputed that the termination order
rendered on June 20, 2006 did not dispose of all the parties and would be considered an
interlocutory order under the general rule. Nevertheless, relying on section 263.401 of the
family code (11) and the Waco Court of Appeals' opinion in In re T.L.S., (12) the Department
contends that the order terminating Mary's parental rights was a final and appealable order.

 Section 263.401 pertains to the dismissal of a suit affecting the parent-child
relationship filed by the Department. (13) Subsection 263.401(a) requires the trial court to
dismiss a suit filed by the Department if the suit has been pending for one year and the
court has not "rendered a final order or granted an extension under subsection (b)." (14) 
Subsection (d) defines a "final order" as an order that "terminates the parent-child
relationship and appoints . . . the department as managing conservator of the child." (15) 

 In In re T.L.S., the court of appeals sought to determine whether a parent, whose
parental rights had been terminated, had timely filed a notice of appeal under subsection
263.405(a), (16) which stated: "An appeal of a final order rendered under this subchapter is
governed by the rules of the supreme court for accelerated appeals in civil cases . . . ." (17) 
Accordingly, subsection 263.405(a) required a party to file a notice of appeal within twenty
days after the trial court entered a final order. (18) The court of appeals sought to define the
term "final order" within subsection 263.405(a) by applying subsection 263.401(d)'s
definition of a "final order," (19) which, as stated above, defines a final order as an order that
terminates the parent-child relationship and appoints the Department as managing
conservator of the child. (20) By applying subsection 263.401(d)'s definition of a "final order"
to subsection 263.405(a), the court of appeals determined that the trial court's complained-of order--which terminated the parental rights of one parent and appointed the Department
as the child's managing conservator--was a final order for purposes of calculating the
appellate timetable, (21) even though it did not adjudicate the rights of all parties to the
proceeding or all pending claims. (22) As a consequence, the court of appeals dismissed the
parent's appeal because she had not filed her notice of appeal within twenty days after the
"final order" was signed. (23)

 Subsection 263.401(d)'s definition of a "final order" and its applicability to subsection
263.405's use of the term "final order" has been discussed by the El Paso Court of
Appeals. In two opinions issued in December 2008, the El Paso Court rejected In re
T.L.S.'s reasoning and found that subsection 263.401(d) is inapplicable to section
263.405. (24) In one of these opinions, the court explained:

 We decline to follow [In re T.L.S.]. The [Waco Court of Appeals] failed
to consider that Section 263.401(d) begins with the phrase[,] "For purposes
of this section . . . ." The plain meaning of that phrase is to limit the
application of the definition to Section 263.401. If the Legislature had
intended for Section 263.401(d)'s definition of "final order" to apply
elsewhere, it would not have limited its application to Section 263.401. (25)


 We agree with the El Paso Court of Appeals. If the Legislature had wanted to make
subsection 263.401(d) applicable to section 263.405, the Legislature would have written
subsection 263.401(d) to begin with the phrase, "For purposes of this subchapter," rather
than, "For purposes of this section . . . ." (26) The Legislature elected not to do this. (27) In
agreement with the El Paso Court of Appeals' holdings in D.R. and M.C., and in
accordance with the Texas Supreme Court's mandate that involuntary termination statutes
be strictly construed in favor of the parent, (28) we find that the trial court's June 20, 2006
order terminating Mary's parental rights was an interlocutory order that did not become final
(for purposes of section 263.405) until the trial court entered the order terminating Bob's
parental rights on August 3, 2006. (29) There is no evidence in the record that the trial court
signed an order of severance so as to make the otherwise interlocutory order against Mary
final for purposes of appeal. Moreover, we observe that the orders terminating Mary's and
Bob's parental rights have the same trial cause number, and that Mary's separate
termination hearing does nothing to negate the interlocutory nature of the June 20, 2006
order against her. (30)

 Mary filed a motion for new trial with the trial court on July 19, 2006. To whatever
extent Mary's motion for new trial can be deemed prematurely filed--due to the fact that
the June 20, 2006 order did not dispose of all the parties in the case (i.e., Bob)--the rules
of civil procedure directed the trial court to deem the motion as having been filed on the
date of but subsequent to the time the order became final (i.e., Mary's motion should be
deemed filed immediately after the trial court entered the order terminating Bob's parental
rights on August 3, 2006). (31)

 Subsection 263.405(b) of the family code states: "Not later than the 15th day after
the date a final order is signed by the trial judge, a party intending to appeal the order must
file with the trial court a statement of the point or points on which the party intends to
appeal. The statement may be combined with a motion for a new trial." (32) 

 Here, Mary's motion for new trial is entitled "Motion for New Trial." It is a three-page
document that sets forth, paragraph by paragraph, the trial court's findings that Mary is
challenging. (33) Although the motion is not entitled "Statement of Points," it clearly contains
a "statement of the point[s]" on which Mary intends to appeal. The trial court held a
hearing on the motion. 

 "Section 263.405 was enacted in 2001 to reduce post-judgment delays and screen
out frivolous appeals." (34) Subsection (i) was added to section 263.405 in 2005 due to the
legislature's displeasure with appellate decisions that allegedly undermined the
legislature's intent in enacting subsection 263.405(b). (35) The legislative history of
subsection (i) reflects the legislature's goal of decreasing post-judgment delays:

Compliance [with section 263.405(b)] as the Legislature intended, would
correct any wrongs 30 days after trial, as opposed to extending reversals
months or years after a trial.


If a mistake is pointed out to the trial court that warrants a new trial, the trial
court can immediately order a new trial, and the Legislature's goal to
decrease post-judgment delays is accomplished. Encouraging appellants to
ignore the post-judgment procedures enacted by the Legislature in 2001, not
only increases the amount of time that abused and neglected children spend
in foster care, it bogs down the appellate courts with mistakes that could
have been quickly and easily corrected at the trial level. (36)


 Courts must read a pleading for its content rather than its label. (37) Considering (1)
the language of the statute permitting a statement to be combined with a motion for new
trial, (2) the legislative goal of correcting mistakes quickly and decreasing post-judgment
delays, and (3) the general rule of construction that requires us to look at the substance
of a pleading rather than the title, we construe Mary's motion for new trial as including a
statement of points, in satisfaction of the requirement of subsection 263.405(b). (38) 
Moreover, because Mary's motion for new trial raised the same issues she now raises on
appeal, we may consider all of the issues Mary has presented in her appellate brief. (39) 
Having determined that section 263.405 does not bar our review of Mary's issues on
appeal, we need not address Mary's arguments attacking the constitutionality of section
263.405. (40)III. Sufficiency of the Evidence

A. Standards of Review

 Involuntary termination of parental rights involves fundamental constitutional rights
and divests the parent and child of all legal rights, privileges, duties and powers normally
existing between them, except for the child's right to inherit from the parent. (41) Termination
must be supported by clear and convincing evidence. (42) This intermediate standard falls
between the preponderance of the evidence standard of civil proceedings and the
reasonable doubt standard of criminal proceedings. (43) It is defined as the "measure or
degree of proof that will produce in the mind of the trier of fact a firm belief or conviction
as to the truth of the allegations sought to be established." (44)

 To terminate parental rights, the trial court must make two findings. First, the parent
must have committed one of the acts prohibited under subsection 161.001(1) of the Texas
Family Code, and second, the termination of parental rights must be in the child's best
interest. (45) Here, the trial court found that the Department had proven by clear and
convincing evidence that Mary had (1) knowingly placed or knowingly allowed T.J.H. to
remain in conditions or surroundings which endangered his physical or emotional well-being; and (2) engaged in conduct or knowingly placed T.J.H. with persons who engaged
in conduct that endangered T.J.H.'s physical or emotional well-being. (46) The trial court also
found that the termination of Mary's parental rights was in the best interest of T.J.H. (47) On
appeal, Mary argues that all of the trial court's findings are supported by legally and
factually insufficient evidence. Our review of Mary's sufficiency challenge is guided by the
Texas Supreme Court's opinion in In re J.F.C., wherein the court stated:

 In a legal sufficiency review, a court should look at all the evidence in the
light most favorable to the finding to determine whether a reasonable trier of
fact could have formed a firm belief or conviction that its finding was true. To
give appropriate deference to the factfinder's conclusions and the role of a
court conducting a legal sufficiency review, looking at the evidence in the
light most favorable to the judgment means that a reviewing court must
assume that the factfinder resolved disputed facts in favor of its finding if a
reasonable factfinder could do so. A corollary to this requirement is that a
court should disregard all evidence that a reasonable factfinder could have
disbelieved or found to have been incredible. This does not mean that a
court must disregard all evidence that does not support the finding. 
Disregarding undisputed facts that do not support the finding could skew the
analysis of whether there is clear and convincing evidence.

 

 . . . .

 

 In a factual sufficiency review, . . . a court of appeals must give due
consideration to evidence that the factfinder could reasonably have found to
be clear and convincing. . . . [T]he inquiry must be whether the evidence is
such that a factfinder could reasonably form a firm belief or conviction about
the truth of the State's allegations. A court of appeals should consider
whether disputed evidence is such that a reasonable factfinder could not
have resolved that disputed evidence in favor of its finding. If, in light of the
entire record, the disputed evidence that a reasonable factfinder could not
have credited in favor of the finding is so significant that a factfinder could
not reasonably have formed a firm belief or conviction, then the evidence is
factually insufficient. A court of appeals should detail in its opinion why it has
concluded that a reasonable factfinder could not have credited disputed
evidence in favor of the finding. (48)


B. The Evidence

1. Stan Smith's Testimony

 Stan Smith is principal and director of the school that T.J.H. attends. As of the date
of the termination hearing, T.J.H. had been attending the school for approximately two
years, as a kindergarten and first-grade student. D.H. was also a student at the school.

 It was Smith's understanding, based on conversations with T.J.H., D.H., and Mary,
that T.J.H. had been sexually abused when he was living with his biological father, Bob. 
T.J.H. told Smith that Bob "had forced he and his sister to watch some pornographic
movies or T.V. or something of that nature[,] and then he would be required to perform
pornographic behavior on his sister, her on him, and the two of them on the father." While
T.J.H. was in kindergarten, Smith concluded that both T.J.H. and D.H. were emotionally
disturbed, and he discussed with Mary his belief that "there was a very great need for [the
children] to get counseling." He also told Mary that, in light of the anger exhibited by the
children, she should take them to "a doctor and see if they didn't need some medication
to help them get through school." During these discussions, Mary expressed concern over
the financial cost of counseling and questioned whether hospitalization was more
appropriate then counseling. Smith did not know if Mary had acquired counseling for the
children prior to the Department requiring her to do so.

 D.H. made a number of outcries to Smith, some of which prompted him to contact
CPS. D.H. complained that she was denied food at home as punishment for bad behavior. 
On some Monday mornings, D.H. would come to school appearing "ravenously hungry." 
Smith also described some of D.H.'s outcries as follows:

 Frequently she would come into school and complain that she had been
knocked by her mother, you know, she said her mom would slap her in the
face and knock her up against a wall and that that would hurt her head, and
that if she used bad language, she was forced to drink vinegar. You know,
[D.H.] described a situation that appeared to be pretty rough at home.

 T.J.H. also made outcries to Smith. In one outcry, T.J.H. told Smith that Mary had
driven him and D.H. to a park in the middle of night ("the park incident"). Mary threatened
to abandon the children at the park and told them "that if something bad happened, that
was just the way it was going to be." Moreover, T.J.H. would describe to Smith "being hit
if he did not behave." According to Smith, "The physical stuff didn't seem to bother
[T.J.H.], but he would come in and tell us he was being called names." On one occasion,
Smith saw T.J.H. with a gash on his head that had been sutured. Upon questioning from
Smith, T.J.H. stated that he had gotten into an accident and that Mary had stitched the
wound herself because she did not want CPS to get involved. Smith acknowledged at trial
that Mary is a licensed vocational nurse and that he did not believe she or anyone else was
responsible for the gash on T.J.H.'s head. (49) 

 While T.J.H. was in kindergarten, Smith saw him at least two or three times a week
for disciplinary reasons. Though the school traditionally did not suspend kindergarten
children for bad behavior, T.J.H.'s "behavior was so out of control" that he was suspended
on at least three occasions. Smith elaborated on some of T.J.H.'s outbursts at the
hearing, stating:

 And in kindergarten on at least two occasions, . . . [T.J.H.'s] behavior was so
out of control that I had to physically restrain him once for almost two hours
because he was trying to run out in the street and he was telling us at that
time that he really didn't care if he got hit by a car and killed; he just did not
care. And we had to hold him because he was kicking--he had kicked me;
he had kicked another teacher; he was trying to kick and hit children because
he was so angry. . . .

 And there was another occasion when [T.J.H.] was--he almost
literally tore my office apart when he had been referred. And we had to
physically restrain him but not for as long that time. (50)

 On the morning of August 22, 2005, the date of the belt incident, an educator at the
school notified Smith of injuries found on T.J.H. Upon seeing T.J.H., Smith observed what
appeared to be injuries. T.J.H. informed Smith that his step-father, Harry, had hit him with
a belt and belt buckle. Smith then reported T.J.H.'s injuries to CPS and the police
department. He also contacted Mary, who picked up T.J.H. from school to take him to the
police department and a hospital. After Mary picked up T.J.H. from school, educators
informed Smith that Mary, upon arriving at the school, primarily expressed concern over
her job, rather than T.J.H.'s injuries. Smith believed that Mary exhibited concern, as well
as "anger and frustration," when she picked up T.J.H. from the school.

 Prior to Mary's arrival, Smith took pictures of T.J.H.'s injuries, which were used as
evidence at Mary's termination hearing. The pictures, as described by Smith, revealed "a
blow to [T.J.H.'s] ear and temple on the right side, "a blow on the back of the legs," "two
different marks, maybe three, from a belt on his back on the left side," and "a blow on his
chest on the left side and looks like it could have been made by a belt."

 When the Department removed T.J.H. from Mary's custody and placed him with a
foster family, he continued to attend the same school. Smith had this to say about T.J.H.'s
behavior after his removal from Mary:

 [T.J.H.'s] behavior was much improved after he was placed in foster
care. He is still not an angel by any means, but his behavior was much more
normal and it was the kind of thing that a teacher could handle by calling the
parents and work out rather than having to send them to the office. He still
had some minor--"minor" meaning he had to go to Saturday school or have
some consequences, but I don't think we had to suspend [T.J.H.] and, as far
as I recall, we did not have to physically restrain him at all during the first
grade.

Aside from T.J.H.'s improved behavior, Smith also observed that, since his removal from
Mary, T.J.H. has been "more able to show his potential to learn," and is "now making
mostly 'A's as a first-grader." But what Smith has "noticed the most is that [T.J.H.'s]
behavior and his expression of being happy is much more improved now." When
questioned as to whether T.J.H.'s behavioral improvement was attributable to the
medicines he began taking after his removal from Mary, Smith credited the change in
parenting for the improvement, stating:

 When [T.J.H.] went into foster care in August and came back to
school with us, I made it a point to go and talk to him . . . . And I asked
[T.J.H.] how he felt. And the first thing he said to me was, "There's always
something to eat. They don't cuss at me, and I never want to go back
home." And we saw almost from the beginning a good change in [his]
behavior. And I don't think he was on any medication at that time. I think
later he saw a doctor and was put on medication. But I can't tell you I
honestly know exactly when he started. What I saw as a change in behavior
was the parenting.

2. Cynthia Black's Testimony

 Cynthia Black, a teacher, was the first adult at the school to notice T.J.H.'s injuries
from the belt incident. On that day, Black was on breakfast duty, where she was watching
the children as they ate their breakfast. T.J.H. approached her and told her that he was
unable to hold onto an item, which was not identified at the termination hearing. Black
asked T.J.H. why he couldn't grip the item, and he showed her his hands. Black saw that
his hands "were swollen and they had marks across the inside of the hands and on the
outside of the hands." T.J.H. told Black that he received the injuries to his hands while
trying to block his face from being hit with a belt. He identified his stepfather, Harry, as the
person who was trying to hit him with the belt. Black then observed what appeared to be
an injury on the side of T.J.H.'s face. T.J.H. told Black that he had other injuries, which
were later examined by another educator. Black immediately notified Smith about T.J.H.'s
condition.

 Black recalled one incident prior to the belt incident, in which she contacted Smith
to discuss T.J.H. being hit. She also recalled T.J.H. outcrying to her that he was not
always fed supper on the weekends, "so on the days that he would come [to school], he
would always eat, like, two or three breakfasts."

3. Anastasia Gonzales's Testimony & Affidavit

 Anastasia Gonzales is a CPS investigator with the Department. On August 22,
2005, Gonzales was assigned to investigate the belt incident. On this day, Mary was
contacted at work about T.J.H.'s injuries, and she was instructed to pick up T.J.H. from
school so he could be given medical attention. Mary and Harry both went to the school to
get T.J.H. A law enforcement authority directed them to immediately take T.J.H. to the
police department. It was at the police department that Gonzales met T.J.H., Mary, and
Harry. T.J.H. was later taken to a clinic and then directed to a hospital. Upon seeing
T.J.H., Gonzales observed a bruise extending from his ear to his cheek, a circular bruise
on his abdomen, and three or four other markings on his abdomen. T.J.H. told Gonzales
that Harry had hit him with a belt earlier that morning. In an affidavit, Gonzales described
her conversation with T.J.H. and the injuries she observed as follows:

 [T.J.H.] indicated that he was spanked this morning for having the TV
plugged in when he was not supposed to because he was grounded. He
stated that his sister, [D.H.], plugged it in and he didn't. He reported that this
morning he was asleep and he awoke by the sound of his father's voice
yelling at him and he said he could not understand what he was saying. 
[T.J.H.] stated that his father started to "shake on him" and began spanking
him with the belt. He claimed that his mother . . . was at work when the
incident occurred this morning. [T.J.H.] also stated that Harry has hit him
and his sister . . . with the belt on other occasions. [T.J.H.] explained that his
stepfather would drink beer and "get crazy" when he drank. . . . During the
interview I observed [T.J.H.] to have injuries to his face, chest, leg, and
abdomen. The bruise on his cheek was light purple. There was a red oval-shaped mark on his chest. There was also a red mark on the side of his
abdomen that appeared to wrap around his body. He also had a cut on his
finger and on his wrist in which he said that the belt hit him while his hands
were down.

Gonzales believed T.J.H.'s bruises were the product of abuse, rather than normal
discipline. Gonzales spoke with Harry at the hospital. Harry denied hitting T.J.H. with a
belt and stated that he believed the injuries stemmed from T.J.H. falling off a coffee table
while fighting with D.H. the previous day.

 Gonzales also spoke with Mary, who stated that she did not know where T.J.H.'s
injuries came from. Mary said she did not know of the injuries when she left for work at
5:45 a.m. that morning. According to Gonzales, Mary's statements to her contradicted an
earlier statement that Mary had made to a doctor that was treating T.J.H.; Mary told this
doctor that T.J.H.'s injuries stemmed from Harry hitting him with a belt. Mary told Gonzales
that she had left bruises and marks on T.J.H. in the past after disciplining him, but she was
not responsible for the markings now found on his body. Mary expressed her belief that
T.J.H. did not require medical attention. Gonzales got the impression that Mary was more
concerned about her job than she was about T.J.H.'s injuries. Mary appeared angry about
having to leave work; she told Gonzales that she had to get a coworker to cover her job
duties. Mary appeared angry and "furious" at T.J.H., and she was inconsiderate of his
feelings. T.J.H. appeared scared in Mary's presence; he told her that "it wasn't his fault." 
Mary did not hold T.J.H. at the hospital. Gonzales believed that Mary was agitated and
inconsiderate towards everyone around her. In her affidavit, Gonzales details Mary's
behavior and conversations she had with Mary, as follows:

 [Mary] was observed to be very upset for having to leave work; she
stated that she was, "losing out of work because she was demanded to
leave." While at the police station, [Mary] was heard telling [T.J.H.] that he
"should be in school learning, not here at the police station." When asked
to have [T.J.H.'s] injuries checked by a doctor, she replied, "You do not get
internal injuries from the scrape." [Mary] indicated that CPS had already
investigated her in the past for the stitches she applied to her son's head and
nothing was done. She claims to be a skilled nurse. While at the police
station she was pacing around in the front lobby and seemed to worry more
about losing her job. . . .


 . . . While a doctor was examining [T.J.H.], [Mary] indicated that this
morning his stepfather hit [T.J.H.] with a belt. She also indicated that she
disciplined [T.J.H.] as well with the belt and admitted to leaving [T.J.H.]
marked and/or bruised when she has disciplined him with a belt.

 

 [Mary] was asked if she had any family members that would be able
to take care of [T.J.H.] for a while. [Mary] claimed she did not have any family
that would help her and refused to leave [T.J.H.] with her mother. She stated
that in the past when her mother did take care of [T.J.H.], he would return
home with bruises that resulted from being disciplined by [Mary's] mother.

 T.J.H., either on August 22 or a later date, told Gonzales that Mary had hit him on
numerous occasions. T.J.H. also told Gonzales that Harry had once handcuffed him to a
door. T.J.H. stated that Harry has handcuffs because he works at a prison and that Harry
handcuffed him because Harry wanted T.J.H. to know how it felt. According to T.J.H.,
Harry was angry with him when the incident occurred.

 Gonzales was assigned to T.J.H.'s case for one or two months. Though the
Department ordered Mary to pay child support for T.J.H. to cover the time he spent in the
Department's care, Mary did not pay any support while Gonzales was assigned to the
case. Gonzales did not know whether Mary or Harry complied with the Department's
directives after her assignment ended. Gonzales was aware, however, that Mary and
Harry had been making efforts to comply; these efforts included Mary and Harry attending
counseling services as instructed by the Department.

 On October 24, 2005, a family service plan was made for Mary and Harry. The
plan's long-range goal for T.J.H.'s permanency was family reunification. The plan
instructed Mary and Harry to satisfy certain objectives; these objectives did not include
staying away from each other. The plan changed when Harry was indicted for injury to a
child as a result of the belt incident. In connection with that incident, the Department
validated that Harry had abused T.J.H. To Gonzales's knowledge, Mary was still living with
Harry, and she had made no efforts to leave him. Gonzales testified that she would be
worried if T.J.H. was returned to both Mary and Harry, stating: "[Mary] has in the past
provided an unsafe environment for her child and I do not feel that she would be protective
of [T.J.H.]."

 Gonzales's affidavit outlined the history of involvement CPS has had with T.J.H. and
his siblings, V.H. and D.H. The children's CPS history, prior to the belt incident, consisted
of 22 referrals: ten referrals contained no disposition; five referrals were "reason to
believe"; four referrals were "ruled out"; one referral was "administratively closed"; one
referral was "unable to determine"; and one referral concerned D.H.'s outcry of sexual
abuse against Bob (D.H.'s step-father and Mary's ex-husband). (51) Of the five referrals with
the disposition "reason to believe," only two of them involved Mary. 

 The first of these two referrals was dated September 1998, which is five months
prior to T.J.H.'s birth. In this referral, the Department found there was "reason to believe"
that Mary had been physically abusive to V.H. and D.H. The allegation in the referral
states: "Young children were slapped and kicked by two adults. Children at times
appeared to be fearful. Both were adults out of control with children." The young children
were V.H. and D.H., and the two adults were Mary and her mother, Johann. The
allegations of physical abuse against V.H. and D.H. were "reason to believe" as to Mary,
and "ruled out" as to Johann.

 In the second referral, the Department found there was "reason to believe" that Mary
had been physically abusive towards T.J.H. The referral, dated February 2003, concerns
allegations that Mary was physically and emotionally abusive to T.J.H. The allegations
consisted of Mary handling T.J.H. roughly (e.g., Mary "picked [T.J.H.] up and sat him down
very hard in a chair"); slapping and threatening T.J.H. with physical punishment even
though he was "not out of control in [his] behavior or even disruptive"; and using foul or
insensitive language with T.J.H. (e.g., "shut up"; "beat your goddamn ass").

4. Mary's Testimony

 After CPS first became involved in the lives of Mary and her children in 1997, the
Department had Mary sign a contract in September 1998, wherein she promised not to
spank her children or engage in other forms of "inappropriate discipline." Mary continued
to spank her children after entering the agreement, but she did not view her discipline as
abuse at the time. In November 1998, Mary was given a family service plan, which
directed her to not engage in any type of discipline that involves verbal abuse or results in
bruising or marks to the children's bodies. Some of the service plans involving Mary's
children stemmed from Mary taking the blame for injuries to her children that she did not
commit. The physical and emotional abuse inflicted onto her children was not caused by
Mary, but was instead caused by Mary's then-husband, Bob.

 Bob physically, sexually, and emotionally abused Mary. Though Mary was aware
of the physical and emotional abuse Bob inflicted on the children, she did not leave him
because she thought they would be in more danger if she did. On multiple occasions, Bob
threatened to kill Mary and the children if they ever left him. Mary, however, did not know
of any sexual abuse Bob was inflicting on the children.

 One day, Mary glimpsed what appeared to be inappropriate contact between D.H.
and Bob. Mary then privately questioned D.H. about what Bob had been doing with her,
at which point D.H. outcried about Bob's inappropriate contact with her. The following day,
Mary took D.H. to the authorities and removed herself and the children from Bob. Bob was
subsequently imprisoned and divorced from Mary.

 With Mary and the children now separated from Bob, D.H. began attending
counseling services. Counseling was not considered for T.J.H. because there was no
suggestion that he had been sexually abused by Bob. Mary still made T.J.H. available for
counseling, but Mary was told that he was too young for counseling or to be medicated. 
It was not until months later that T.J.H. began engaging in behavior indicating that he had
been sexually abused.

 At the termination hearing, the Department suggested that Mary had reason to
believe that Bob was (or, alternatively, was capable of) sexually abusing her children early
on in their relationship. Mary denied the existence or significance of events that the
Department sought to portray as warning signs of Bob's deviant, sexual behavior. Mary
conceded she was aware of Bob's practice of walking around nude in front of the children. 
Mary vocalized to Bob her problems with this behavior, but she once again felt she could
not remove herself and the children from Bob because of his threats against them.

 Mary does not believe Harry hit T.J.H. with a belt on the day of the belt incident, and
she has not separated from Harry because the family service plan calls for both of them
to attend counseling services. Mary denied telling T.J.H.'s doctor--as if she believed it to
be a fact--that Harry hit T.J.H. with a belt. Rather, she only told the doctor that T.J.H. was
at the hospital because there was an accusation that Harry hit T.J.H. with a belt. 
Moreover, Mary revealed at the termination hearing that, when T.J.H. was removed from
her care, she was against him being placed with her mother because her mother had a
history of bruising him.

 Mary argued that T.J.H. should be returned to her because she removed herself
from Bob and she and Harry have been receiving services since T.J.H. entered the
Department's custody. At the time of the termination hearing, Mary and Harry were
receiving counseling services from a therapist named Mary Ann Johnson; the therapy
sessions had been ongoing for the past four or five months. Mary and Harry began seeing
Johnson soon after their counseling sessions with another counselor, Steve Bain,
terminated. Mary conceded her failure to pay child support to the Department as directed;
she maintained, however, that financial difficulties kept her from making payments and that
she was fully prepared to pay the full amount owed on the day of her hearing.

5. Debra Sublett's Testimony

 Debra Sublett, a licensed professional counselor, counseled T.J.H. and his older
sister, D.H. Sublett began counseling D.H. in May 2004, when D.H. was eight years old. 
The record is unclear as to how often or for what span of time Sublett counseled D.H. At
the time Sublett began counseling D.H., D.H. had "[l]ots of anger, aggression, acting out
behaviors in the school system, defiance, problems attending to school, problems with
school work, lots of anxiety, some depression, [and] fears." Sublett believed that D.H. had
been exposed to harmful behavior, a conclusion she reached based on D.H.'s behavior
during counseling. Sublett detailed some of D.H.'s behavior at Mary's termination hearing:

 [D.H.] would frequently act out--as in our playroom, we have calm toys like
families and animals. We also have aggressive toys such as knives,
handcuffs, swords, those kind of things. She would frequently grab the toy
guns, the toy knives, put guns to her head, say, "I'm going to blow my head
off because I'm no good." She would frequently put a knife to her throat, a
toy knife, say, "I'm going to die. I know I'll die."

 In September 2005, approximately one month after T.J.H. was removed from Mary's
care, Sublett began counseling T.J.H. weekly; the record indicates that these weekly
meetings were still ongoing at the time of Mary's termination hearing. Sublett testified
about the behavior and self-esteem T.J.H. exhibited when she first began seeing him:

 When we begin, lots of anger, lots of aggression toward himself and other
children; very low self-esteem, very negative attitude toward himself. He
would frequently say things such as "I'm stupid. I'm no good. I hate
everybody; everybody hates me." He would be defiant; in the playroom,
itself, in the sessions, very aggressive with the toys, very aggressive play. 
He would set up the toys and then he would be thrilled with the idea that
they're going to all be killed, and those are his quotes, "killed." Repeatedly
just anger and aggression. I have a punching bag we use sometimes in
therapy and he would repeatedly beat this bag and just get very, very, angry,
very animate [sic] when he was beating it saying, "Take this. You take this." 
So those kind of things.

Sublett did not believe that T.J.H. was engaging in age-appropriate behavior. She believed
that T.J.H. had been exposed to behavior that was "very harmful" to his emotional well-being.

 Sublett testified that, while counseling with T.J.H. and discussing his biological home
with him, T.J.H. "would sometimes say things such as 'I don't like it when bad words are
said like 'stupid' and 'shut up.''" Sublett did not testify whether T.J.H., in making those
statements, credited Mary or Harry as the ones using the words he did not like. According
to Sublett, T.J.H. would not speak of Mary or Harry at counseling; Sublett would attempt
to discuss his home life, but "[T.J.H.] would always generally completely shut down. He
didn't want to talk."

6. Deborah Black's Testimony

 Deborah Black works for the Women's Shelter of South Texas; she is a visitation
coordinator, which requires her to supervise parent-child visits. Black was in charge of
supervising visits between Mary and T.J.H. The visitation arrangement allowed for Mary
to visit with T.J.H. once every two weeks, for two hours. Black supervised eighteen visits. 
The first visit occurred on October 7, 2005, and the last scheduled visit was for June 16,
2006--three days before Mary's termination hearing began.

 Mary was consistent on attending her scheduled visits. Only two scheduled visits
were canceled, and both of these cancellations were due to the foster family not bringing
T.J.H. to the visit location. When the visits first started, T.J.H. was very reluctant to visit
with Mary, but T.J.H. grew more comfortable once Black further introduced herself to T.J.H.
and explained to him that he had the power to end the visit at any time. There were times
at the visits when T.J.H. became "distressed," but this typically occurred when Mary would
start to cry. Black explained that "[i]f [T.J.H.] sees . . . that [Mary's] relaxed, then he's
usually a little bit more relaxed and more open in the visits." As the visits continued, T.J.H.
became more relaxed "[t]o some degree."

 On the date of the last scheduled visit, Black received a call from Ronald, T.J.H.'s
foster parent. Ronald informed Black that T.J.H. did not want to attend the visit. Black
directed Ronald to bring T.J.H. to the visit location. When T.J.H. arrived, Black asked him
why he did not want to visit with Mary. T.J.H. explained that he did not want to see her
upset. T.J.H. began to worry that Mary would be upset after he had a recent conversation
with Ronald. Black explained the substance of that conversation at the hearing:

 Well, [Ronald] and his wife had talked to [T.J.H.] to make him aware
of the termination hearing. They talked to him about the possible outcomes. 
So [T.J.H.] knew that there was a hearing today and he knew kind of,
basically, what was going to happen; that, you know, that either his mother
was going to get him back or that her rights were going to be terminated. I'm
not sure he understood everything. But he was afraid his mother would be
upset because the hearing was so close. At least, that's my take on it.

Black explained the situation to Mary. Mary wanted to speak with T.J.H., and Black
allowed her to do so. In the presence of Black, a caseworker, and Ronald, Mary informed
T.J.H. that this visit could be the last time she was able to see him. Mary was crying, and
she asked T.J.H. to visit with her. T.J.H. stated that he did not want to visit. Mary grew
more emotional; she began pleading with T.J.H. to visit with her. After T.J.H. repeated that
he did not want to visit, Black ended the meeting.

7. Ronald's Testimony

 Ronald and his wife have been T.J.H.'s foster parents since August 2005--the
month T.J.H. was removed from Mary's care. Along with T.J.H., Ronald and his wife have
five children: two biological children and three foster children. When T.J.H. came into their
care, T.J.H. required immediate dental work; this consisted of fillings and a tooth extraction. 
T.J.H. was uncomfortable and unruly when he first joined his foster family, but his comfort
and behavior has improved with time. On one occasion, T.J.H. told Ronald that he has
had his "ass whipped." The record contains no additional details regarding what exactly
T.J.H. was referring to when he made that statement.

 After a few months of living under his foster family's care, T.J.H. was hospitalized
for eighteen days after exhibiting aggressive behavior towards others; this behavior
involved T.J.H. hitting students and teachers and expressing increased outrage at home. 
It is unclear how long T.J.H. was living in his foster family's home prior to his
hospitalization; at Mary's termination hearing, T.J.H.'s hospitalization is only described as
being "recent." Prior to his hospitalization, T.J.H. was taking two behavioral medications. 
After his hospitalization, T.J.H. was given five additional medications for his behavior. 
Together, these medications are intended to help with Attention Deficit Hyperactivity
Disorder, mental and mood disorders, depression, and anger control.

 According to Ronald, T.J.H. has expressed a desire to remain with him and his wife
and to not return to Mary. With regard to Mary's last scheduled visit with T.J.H., Ronald
stated that T.J.H. did not want to visit with Mary because he did not want to see her cry or
frustrated. At the time of the termination hearing, Ronald and his wife had not discussed
adopting T.J.H.

8. Pamela Campbell's Testimony

 Pamela Campbell is a caseworker for the Department; she was the caseworker
assigned to T.J.H. at the time of the termination hearing. Campbell believes that Mary has
endangered T.J.H. and that the termination of Mary's parental rights is in T.J.H.'s best
interest. Campbell's belief is predicated on what she knows about Mary's history with the
Department, as well as Mary's recent interaction with T.J.H. As explained by Campbell at
the hearing:

 [W]hen [Mary] comes to the visits with [T.J.H.], and he is a hyperactive child;
there's no question about that. As long as they're playing board games or
doing things together like that that's quiet, they have a real good rapport and
they do well. When [T.J.H.] gets up and begins to bounce around, it agitates
her and upsets her. So, you know, I'm not sure that she can deal with a child
with this behavior. I think that probably in the past with my experience with
these children that have A.D.H.D. that they do provoke the parents. And that
causes a lot of these problems.

Campbell, however, never saw any of Mary's visitations with T.J.H.; her take on Mary's
behavior during visitation was attributable to reports others in the Department had made. 
Altogether, Campbell met with T.J.H. three times, talked on the phone three times with
Mary, and met with Mary one time out of court.

 Campbell explained that Mary's family service plan had to be changed from
reunification to termination when Harry was indicted for injuring T.J.H. because "[Harry] is
not allowed to be around [T.J.H.] as long as he's been indicted." Campbell stated that a
new service plan was not drafted when the Department abandoned its reunification goal. 
Campbell notified Mary over the phone that the Department had adopted a new service
plan, but she failed to inform Mary that she should separate from Harry under this plan. 
The only difference between the old plan and the new plan was that reunification was not
being sought; the services that Mary and Harry were expected to complete under the old
plan still remained under the new plan. As explained by Campbell at the hearing: "We do
that because, in case we do not get termination and [T.J.H.] goes home, [Harry] still has
to have those services. If he doesn't--if he's not convicted and they remain together, he
still has to have these services. We believe it's in [T.J.H.'s] best interest."

9. Alice W.'s Testimony

 Alice W. is a teacher who instructed T.J.H. when he was in kindergarten and under
Mary's care. Alice had no nutritional concerns relating to T.J.H., explaining that T.J.H. was
"[a]lways very clean, well-groomed, nutritionally had snacks." Alice described him as a very
bright, creative, and expressive child; a strong reader; a capable student; and one prone
to unexplained outbursts of anger. During these outbursts, T.J.H. would at times get
physical with other children, flip his desk over, or had to be physically restrained. Alice 
revealed discussions she had with T.J.H. when he was her student. She recalled him
telling her about Mary applying sutures to his head, and one occasion in which he told her
that Mary had called him an "idiot." Alice, who still sees and communicates with T.J.H. in
the school hallways now that he has progressed to another grade level, testified that he
"seems very cheerful and bouncing and hopping along as he goes down the hallway; [he]
seems very, very content; very happy."

 Alice also testified about her interaction with Mary while T.J.H. was one of Alice's
students, stating:

 [Mary and I] worked very, very closely. We had a very open relationship. 
We talked numerous times. Sometimes--I would say initially at the
beginning, we talked maybe every week to every ten days and felt very
comfortable about calling Mary and she, I felt like, would return calls from
work or wherever she was at the time and came in for some regular teacher-parent conferences and very, very open communication. Our regular
scheduled conferences that we had middle of the year and end of the year,
she attended those and, yes, we worked very closely together.

 

 . . . .

 

 I felt very comfortable picking the phone up and calling her on every
occasion, any occasion. She was helpful; in that she provided some little
holiday treats for our children, our class, the whole class. [T.J.H.] was very
proud of that. That meant a lot to him. For lots of occasions. They . . . I
just--I always felt like I could talk very openly to her and we had a--say
mother-mother but a mother-mother-teacher relationship where I felt like I
could talk to her and tell her that I'm very, very concerned; the hostility and
the anger is there. (52)

10. Joe's Testimony

 Joe is D.H.'s biological father. To Joe's knowledge, Mary never placed D.H. in
counseling until she was ordered by the State, and then she failed to fully follow through
with it. Joe credits Mary for removing D.H. from Bob, who sexually abused D.H., stating: 
"I know when she found out one hundred percent sure, she went straight down to sheriff's
department and started."

 At the time of Mary's termination hearing, Joe had custody of D.H. Mary was
allowed to have supervised visitation. The last time Mary visited with D.H. was in March
2006. After that time, Joe stopped complying with the visitation agreement because the
individual in charge of the visitation would fail to supervise for the full duration of the visit.

 Joe testified that D.H. has complained to him about being hit, being called
derogatory names, and not being fed regularly while living with Mary. D.H. also
complained about T.J.H. being hit. Joe did not elaborate on D.H.'s complaints.

11. Steve Bain's Testimony

 Steve Bain, a licensed professional counselor for the State of Texas, testified that
he began meeting with Mary and her current husband, Harry, in late-September 2005 (a
little less than two months after the Department took possession of T.J.H.). In the course
of seven or eight meetings, with each meeting lasting approximately thirty-five to forty-five
minutes, Bain either met individually with Mary or Harry, or he met with both of them
together. A job change forced Bain to stop meeting with Mary and Harry in November
2005. While the meetings were taking place, however, Bain became concerned that T.J.H.
was not safe under Mary's care because of anger management issues that surfaced in his
conversations with Mary. Bain performed a test on Mary, referred to as a State-Trade
Anger Expression Inventory (STAXI-2), the results of which, according to Bain, "indicate[d]
that [Mary] both suppresses extremely intense angry feelings and then expresses them in
aggressive ways." Bain could not state an opinion as to whether Mary could learn to better
control her anger because he did not spend enough time evaluating her.

12. Mary Ann Johnson's Testimony

 Mary Ann Johnson, Mary's only witness, is a licensed professional counselor. Mary
and Harry began meeting with Johnson in February 2006 for the purpose of satisfying the
Department's family service plan. Mary and Harry had previously been meeting with Steve
Bain. From February 2006 to the present, Mary and Harry have actively and consistently
pursued Johnson's counseling services, meeting with her once every week. The
counseling involves learning how to establish family values and morals. Johnson believes
that Mary's and Harry's attitudes have improved as the counseling has progressed, stating: 
"I think they've learned to be more open, a little bit more comfortable. It's far from where
it needs to be, but I think we're going in the direction it needs to be given the amount [of]
time. . . . I can't say they haven't been cooperative or compliant or haven't done anything
I've asked them to do."

 The bulk of Johnson's information about T.J.H.'s and the Department's history with
Mary has come from Mary herself. With regards to Mary, Johnson had this to say at the
termination hearing:

 I think Mary is--I think she has a strong mother bond to her child. I think
Mary has quite a few shortcomings and I think she has, I'll say, some
blinders on I think that prohibit her or kept her from being--from anticipating
problems that have come to--you know, that's why we're here I think.

Based on her conversations with Harry, Johnson believed that Harry and T.J.H. were
beginning to form a relationship when T.J.H. was placed in the Department's custody,
stating:

 I get the sense or the impression that [T.J.H.] and [Harry] were forming a
relationship. . . . [Harry] speaks very fondly of [T.J.H.]. Numerous times he
feels this burden about what to do with--for [T.J.H.] and for Mary. So I get
the sense that he really is--doesn't know what to do to resolve this issue.

 

 But going to the relationship with [T.J.H.] is that it was in formation.
[Harry] is an experienced parent. He has two children of his own and they're
almost grown. One is 18 and the other is 14, I believe. So he has some of
those experiences to draw from, to share with someone who is much
younger . . . .

 Johnson believes that there is a need for Mary, Harry, and T.J.H. to be in counseling
together. If this were to happen, Johnson believes the potential for improvement is "more
than good," explaining: "It will depend on the commitment of Mary and [Harry] . . . . But
I think that what they've shown to me at least in the last few months is that they are
committed now in the counseling and have asked for it recently again. So I'd say more
than good." When questioned as to whether she would support a recommendation that
Mary, Harry, and T.J.H. be reunited with the condition that they continue with counseling
together, Johnson stated she would feel comfortable in joining that recommendation.

C. Subsection 161.001(1)(E)

 Mary argues that the evidence was legally and factually insufficient to support a
finding of endangerment under subsection 161.001(1)(E), which authorizes a court to
terminate a parent-child relationship if the court finds by clear and convincing evidence that
the parent engaged in conduct, or knowingly placed the child with persons who engaged
in conduct, that endangered the child's physical or emotional well-being. (53) The Texas
Supreme Court has defined "endanger" to mean exposing a child to loss or injury, or
jeopardizing a child's emotional or physical health. (54) While endangerment means more
than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family
environment, it is not necessary that the conduct be directed at the child or that the child
actually suffer injury. (55)

 Under subsection (E), the relevant inquiry is whether evidence exists that the
endangerment of the child's physical and emotional well-being was the result of the
parent's conduct, including acts and omissions. (56) To be relevant, the conduct does not
have to have been directed at the child nor must actual harm result to the child from the
conduct. (57) Additionally, termination under subsection (E) must be based on more than a
single act or omission; a voluntary, deliberate, and conscious course of conduct by the
parent is required. (58) The specific danger to the child's well-being need not be established
as an independent proposition, but may be inferred from parental misconduct. (59)

 Considering only the evidence that tends to support the trial court's finding, we find
the trial court could have reasonably decided that Mary engaged in a course of conduct
that endangered T.J.H.'s physical or emotional well-being. The trial court could have found
that T.J.H.'s physical well-being was endangered based on (1) the CPS referral containing
a reason-to-believe disposition that Mary had been physically abusive with V.H. and D.H.; (60)
(2) the CPS referral containing a reason-to-believe disposition that Mary had been
physically abusive with T.J.H.; (3) D.H.'s outcry that Mary had knocked her up against a
wall, hurting her head; (4) Mary's failure to protect T.J.H. and D.H. from Bob's physical
abuse prior to D.H.'s outcry of sexual abuse; and (5) Mary's decision to continue living with
Harry after the belt incident. Moreover, the trial court could have found that T.J.H.'s
emotional well-being was endangered based on the following evidence: (1) the CPS
referral that contained a "reason to believe" allegation that Mary was emotionally abusive
with T.J.H.; (2) Mary's use of derogatory language against D.H. and T.J.H.; (3) Mary's
behavior on the night of the park incident; (4) Mary's behavior towards T.J.H. on the day
of the belt incident; and (5) Mary's failure to provide T.J.H. with the counseling services
offered to him. (61)

 After considering the record as a whole, we further conclude the evidence is more
than sufficient to show that the trial court, as factfinder, could reasonably form a firm belief
or conviction that Mary engaged in conduct dangerous to the children's physical or
emotional well-being. Though Mary's and Harry's attendance of family counseling services
is relevant to rebutting the trial court's finding of endangerment, (62) the evidence of improved
conduct does not conclusively negate the probative value of the laundry list of irresponsible
choices and behavior that support the trial court's finding. Thus, the evidence is factually
sufficient to support the trial court's finding. Because the evidence is legally and factually
sufficient to support the trial court's determination under section 161.001(1)(E), we need
not address the other endangerment ground the court found to support termination.

D. Best Interest

 In parent-child termination proceedings, there is a strong presumption that the
children's best interest is usually served by keeping them with their natural parents. (63) The
Texas Supreme Court has recognized several factors to consider in determining whether
termination is in a child's best interest. (64) These include: (1) the desires of the child; (2) the
emotional and physical needs of the child now and in the future; (3) the emotional and
physical danger to the child now and in the future; (4) the parental abilities of the
individuals seeking custody; (5) the programs available to assist those individuals to
promote the best interest of the child; (6) the plans for the child by these individuals or by
the agency seeking custody; (7) the stability of the home or proposed placement; (8) the
acts or omissions of the parent which may indicate the existing parent-child relationship is
not proper; and (9) any excuse for the acts or omissions of the parent. (65) This list of factors
is not exhaustive, and no single consideration is controlling. (66) Likewise, a fact finder is not
required to consider all of the listed factors. (67)

 Testimony from Smith and Ronald reveals that T.J.H. does not wish to return to
Mary. The evidence shows that T.J.H.'s emotional needs are currently being met by his
foster family. They have provided T.J.H. with the counseling and medical services
necessary to bring stability to his life; as a result, T.J.H.'s demeanor has improved and he
has not had uncontrollable outbursts at school. The evidence supporting the trial court's
finding of endangerment under subsection 161.001(1)(E) also supports a conclusion that
Mary would pose a continuing danger to T.J.H.'s physical or emotional well-being now and
in the future. Ronald and his wife, who along with T.J.H. are caring for five children, have
demonstrated suitable parenting skills and a desire to safeguard T.J.H.'s physical and
emotional well-being. And unlike Mary, the foster family has demonstrated a willingness
to afford T.J.H. the counseling and medical care he needs. Lastly, there is little that can
be found in the record to excuse Mary's blameworthy acts or omissions toward T.J.H.

 In light of all of the evidence, the trial court could have reasonably formed a firm
belief or conviction that termination of Mary's parental rights was in T.J.H.'s best interest. 
Accordingly, we hold that the evidence is both legally and factually sufficient to support the
trial court's finding that termination of Mary's parental rights was in the best interest of
T.J.H. We thus overrule Mary's legal and factual sufficiency challenges.

IV. Ineffective Assistance of Counsel

 In her last issue on appeal, Mary argues that the trial court erred in denying her
motion for new trial, wherein she protested receiving ineffective assistance of counsel at
her termination hearing. The Texas Supreme Court has held that the statutory right to
counsel in parental rights termination proceedings includes a guarantee that counsel will
perform effectively. (68) In analyzing the effectiveness of counsel in a parental rights
termination case, we follow the standard set forth by the United States Supreme Court in
Strickland v. Washington. (69) To prevail on an ineffective assistance of counsel claim, one
must show by a preponderance of the evidence that (1) trial counsel's performance was
deficient in that it fell below an objective standard reasonableness, and (2) a reasonable
probability exists that but for counsel's unprofessional errors, the result of the proceeding
would have been different. (70)

 "With respect to whether counsel's performance in a particular case is deficient, we
must take into account all of the circumstances surrounding the case, and must primarily
focus on whether counsel performed in a 'reasonably effective' manner." (71) We examine
the totality of counsel's representation to determine whether appellant received effective
assistance, but do not judge counsel's strategic decisions in hindsight; rather, we give
"great deference" to counsel's performance and strongly presume that counsel's conduct
falls within the wide range of reasonable professional assistance. (72) It is only when 'the
conduct was so outrageous that no competent attorney would have engaged in it that the
challenged conduct will constitute ineffective assistance. (73) Any allegation of
ineffectiveness must be firmly founded in the record, and the record must affirmatively
demonstrate the alleged ineffectiveness. (74)

 Mary argues that her trial counsel was ineffective because of his failure to present
certain evidence.

 First, Mary complains about her trial counsel's failure to present "the CPS video
recordings of [T.J.H.'s] interviews" after the belt incident. The videotapes were not shown
to the trial court during the hearing on Mary's motion for new trial. Mary asks this Court to
assume, based on the Department's failure to present the tapes, that the tapes were
favorable to her case. We cannot, however, engage in such speculation. (75)

 Second, Mary complains that her trial counsel failed to give her the opportunity to
explain why T.J.H.'s injuries could not have been caused the morning of the belt incident
and why the injuries could not have been caused by a belt. The record of the termination
hearing, reveals the following exchange between Mary and her trial counsel:

 Q: You have any explanation for those bruises that, you know, are
showing up on those pictures [from the belt incident]?

 

 A: I have no idea how they would have gotten there. I can just think of
numerous' you know; numerous, you know, things that he could have
done to get them. But I have no explanation, no.

 

 Q: You did not see those over the weekend or prior to Monday when he
was at the hospital?

 

 A: No sir. I saw them when I got to the school.


The record thus indicates that Mary's trial counsel gave her ample opportunity to discuss
her thoughts on T.J.H.'s bruises. Any opinion that Mary failed to express about T.J.H.'s
bruises cannot be blamed on her trial counsel.

 Third, Mary complains about her trial counsel's failure to present medical records
stemming from the medical evaluation T.J.H. received the day of the belt incident. The
records indicate that T.J.H.'s body had bruising and a rash, but nothing else. This is not
inconsistent with (1) the testimony of multiple witnesses who saw T.J.H. the day of the belt
incident, or (2) the pictures of T.J.H.'s injuries, which were presented at the termination
hearing. The medical records do not negate this evidence. Furthermore, Mary notes that
the records do not indicate that the doctor evaluating T.J.H. attributed his bruises to
physical abuse. The mere fact that the doctor did not express an opinion as to whether
T.J.H.'s bruises were caused by physical abuse, however, does not negate the evidence
supporting a finding of physical abuse. The trial court heard multiple witnesses testify that
T.J.H. had attributed his bruises to being hit with a belt by Harry.

 Fourth, Mary complains about her attorney's failure to present additional favorable
testimony from Mary Ann Johnson. Johnson, a counselor who Mary and Harry had been
meeting with, testified at the termination hearing. Mary complains that her attorney failed
to give Johnson copies of psychological evaluations done on Mary's family prior to any
meetings with Johnson. But when asked at the motion-for-new-trial hearing whether
seeing the psychological evaluations was important to her testimony in the case, Johnson
responded, "No, not really." According to Johnson, she only wanted to review the
evaluations to substantiate statements that Mary had made to her. At the hearing on
Mary's motion for new trial, Johnson was asked if there was any important matter on which
Mary's attorney failed to question Johnson at the termination hearing. Johnson replied that
she could not remember anything specific.

 With regard to the four aforementioned complaints, we find that the record does not
affirmatively demonstrate the alleged ineffectiveness. There are, however, four more
complaints that Mary raises. One of these complaints concerns the failure of Mary's
attorney to present the testimony of Laurie Gonzales, whose testimony would have called
into question whether Harry was responsible for bruising T.J.H. on the day of the belt
incident. The other remaining three complaints concern her attorney's failure to present
psychological evaluations of T.J.H., Mary, and Harry. 

 Although Mary filed a motion for new trial, on which a hearing was held, her trial
counsel did not attend the hearing. In the absence of a proper evidentiary record
developed at a hearing on a motion for new trial, it is extremely difficult to show that trial
counsel's performance was deficient. (76) When there is no hearing on a motion for new trial
or if trial counsel does not appear at such a hearing, an affidavit from trial counsel
becomes almost vital to the success of a claim of ineffective assistance of counsel. (77) Here,
there is no such affidavit in the record. Mary has not rebutted the presumption that her trial
counsel made all significant decisions in the exercise of reasonable professional judgment,
and Mary has not demonstrated in the record that trial counsel rendered ineffective
assistance. We will not speculate about counsel's strategic decisions, and thus, we cannot
find Mary's trial counsel ineffective based on the four remaining complaints. We thus
overrule Mary's final issue on appeal.

V. Conclusion

 We affirm the trial court's decree of termination.

 

 

 LINDA REYNA YAÑEZ,

 Justice


Memorandum Opinion delivered and 

filed this the 26th day of August, 2009.
1. To protect the privacy of the minor child and the parties, we have substituted fictitious names for the
parties, and refer to the child by his initials. See Tex. Fam. Code Ann. §109.002(d) (Vernon 2008); Tex. R.
App. P. 9.8(b)(2).
2. See Tex. Fam. Code Ann. § 161.001(1)(D), (E) (Vernon 2008).
3. See id. § 161.001(2).
4. Paragraph (b) of the version of section 263.405 in effect at the time the Department filed its original
petition in this case stated that "[n]ot later than the 15th day after the date a final order is signed by the trial
judge, a party intending to appeal the order must file with the trial court a statement of the point or points on
which the party intends to appeal. The statement may be combined with a motion for a new trial." Act of June
15, 2001, 77th Leg., R.S., ch. 1090, § 9, 2001 Tex. Gen. Laws 2395, 2397-98, amended by Act of June 16,
2007, 80th Leg., R.S., ch. 526, § 2, 2007 Tex. Gen. Laws 929; see Act of June 16, 2007, 80th Leg., R.S., ch.
526, § 6, 2007 Tex. Gen. Laws 929, 929-30 ("The changes in law made [to this subsection] apply only to a
suit affecting the parent-child relationship filed on or after the effective date of this Act [ June 16, 2007]. A suit
affecting the parent-child relationship filed before the effective date of this Act is governed by the law in effect
on the date the suit was filed, and the former law is continued in effect for that purpose.") (current version at
Tex. Fam. Code Ann. § 263.405(b), (b-1) (Vernon 2008)). The Department filed suit for termination of parental
rights as to T.J.H. on August 23, 2005; the termination order is dated June 20, 2006. This case is therefore
governed by the previous version of the statute. The Texas Supreme Court recently noted that the 2007
amendments "made no apparent substantive change to the statement of points requirement." In the Interest
of J.O.A., 283 S.W.3d 336, 341 n.2 (Tex. 2009). Unless otherwise specified, all references in this opinion to
section 263.405 are to the former version of the statute. 
5. Tex. Fam. Code Ann. § 263.405(b).
6. Id. (emphasis added).
7. Id. § 263.405(d).
8. See id. § 263.405(b) (allowing for a statement of points to be combined with a motion for new trial).
9. See Tex. R. Civ. P. 306c ("No motion for new trial or request for findings of fact and conclusions of
law shall be held ineffective because prematurely filed; but every such motion shall be deemed to have been
filed on the date of but subsequent to the time of signing of the judgment the motion assails . . . .").
10. See Lehmann v. Har-Con Corp., 39 S.W.3d 191, 195 & n.12 (Tex. 2001).
11. See Act of May 28, 1997, 75th Leg., R.S., ch. 603, 1997 Tex. Sess. Law Serv. 2123 (amended
2001, 2005, 2007) (current version at Tex. Fam. Code Ann. § 263.401 (Vernon 2008)). Unless otherwise
specified, all references in this opinion to section 263.401 are to the version of the statute in effect when the
Department filed suit, which is the version prior to the 2007 amendments. 
12. 143 S.W.3d 284 (Tex. App.-Waco 2004, no pet.). 
13. Tex. Fam. Code Ann. § 263.401.
14. Id. § 263.401(a) (emphasis added).
15. Id. § 263.401(d); See Act of May 28, 1997, 75th Leg., R.S., ch. 603, 1997 Tex. Sess. Law Serv.
2123, repealed by Act of May 27, 2007, 80th Leg., R.S., ch. 866, § 5 (repealing section 263.401(d)); § 6 ("The
changes in law made by this Act to Sections 263.401, 263.402, and 263.403, Family Code, apply only to a suit
affecting the parent-child relationship filed on or after the effective date of this Act [September 1, 2007]. A suit
affecting the parent-child relationship filed before the effective date of this Act is governed by the law in effect
at the time the suit was filed, and the former law is continued in effect for that purpose."), 2007 Tex. Sess. Law
Serv. 1841-42. 
16. 143 S.W.3d at 287-89.
17. Tex. Fam. Code Ann. § 263.405(a) (emphasis added).
18. See Tex. R. App. P. 26.1(b) (stating that "in an accelerated appeal, the notice of appeal must be filed
within 20 days after the judgment or order is signed").
19. In re T.L.S., 143 S.W.3d at 287.
20. Tex. Fam. Code Ann. § 263.401(d)(4).
21. In re T.L.S., 143 S.W.3d at 289.
22. Id. at 287.
23. Id. at 290.
24. See D.R. v. Tex. Dep't of Family & Protective Servs., 281 S.W.3d 598, 600-01 (Tex. App.-El Paso
2008, no pet.); M.C. v. Tex. Dep't of Family & Protective Servs., No. 08-08-00053-CV, 2008 Tex. App. LEXIS
9184, *5-8 (Tex. App.-El Paso Dec. 11, 2008, no pet.).
25. M.C., 2008 Tex. App. LEXIS 9184, at *7-8.
26. Tex. Fam. Code Ann. § 263.401(d)(4) (emphasis added).
27. We observe that the Legislature has used the phrase, "For purposes of this subchapter," to limit
the applicability of a definition elsewhere in the family code. See, e.g., Tex. Fam. Code. Ann. § 3.402(a) ("For
purposes of this subchapter, 'economic contribution' is the dollar amount of . . . .").
28. Holick v. Smith, 685 S.W.2d 18, 20 (Tex. 1985).
29. See D.R., 281 S.W.3d at 600-01; M.C., 2008 Tex. App. LEXIS 9184 at *5-8; see also In re C.H.,
No. 2-09-060-CV, 2009 Tex. App. LEXIS 3940, *1-3 (Tex. App.-Fort Worth June 4, 2009, no pet. h.) (mem.
op.). 
30. See In re Allstate County Mut. Ins. Co., 209 S.W.3d 742, 745 (Tex. App.-Tyler 2006, orig.
proceeding) (noting the distinction between severance, which divides the lawsuit into two or more separate
and independent causes, from bifurcation, which leaves the lawsuit intact but enables the court to determine
issues at separate hearings, and concluding that the order entered after a separate trial is often interlocutory);
In re Ben E. Keith Co., 198 S.W.3d 844, 850 (Tex. App.-Fort Worth 2006, orig. proceeding) (also noting the
distinction between a severance, which results in a final, appealable judgment, and an order for separate
trials, which often results in an interlocutory judgment); see also Tex. R. Civ. P. 41 (authorizing severance);
Tex. R. Civ. P. 174(b) (authorizing bifurcated trials).
31. See Tex. R. Civ. P. 306c.
32. Tex. Fam. Code Ann. § 263.405(b) (emphasis added).
33. For example, paragraph two asserts ineffective assistance of counsel. Paragraph three challenges
the legal and factual sufficiency of the trial court's "finding that termination of the parent-child relationship was
in the best interests of the child." See Tex. Fam. Code Ann. § 161.001(2) (Vernon 2008). Paragraph four
challenges the legal and factual sufficiency of the trial court's finding that Mary "knowingly placed or knowingly
allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being
of the child." See id. § 161.001(1)(D). Paragraph 5 challenges the legal and factual sufficiency of the trial
court's finding that Mary "engaged in conduct or knowingly placed the child with persons who engaged in
conduct which endangers the physical or emotional well-being of the child." See id. § 161.001(1)(E). 
34. See In the Interest of R.J.S., 219 S.W.3d 623, 625 (Tex. App.-Dallas 2007, pet. denied). 
35. See id. at 626 (citing In re D.A.R., 201 S.W.3d 229, 230 nn.1-2 (Tex. App.-Fort Worth 2006, no pet;
In re E.A.R., 201 S.W.3d 813, 815, n.2 (Tex. App.-Waco 2006, no pet.) (Vance, J., concurring)). 
36. In re E.A.R., 201 S.W.3d at 815, n.2 (quoting HOUSE COMM. ON JUVENILE JUSTICE AND
FAMILY ISSUES, BILL ANALYSIS, Tex. H.B. 409, 79th Leg., R.S. 2005, available at
http://www.capitol.state.tx.us/cgi-bin/tlo/textframe.cmd?LEG=79&SESS=R&CHAMBER=H&BILLTYPE=B&BILLSUFFIX=00409&VERSION=2&TYPE=A.). 
37. See generally Tex. R. Civ. P. 71; State Bar of Tex. v. Heard, 603 S.W.2d 829, 833 (Tex. 1980);
Johnson v. State Farm Lloyds, 204 S.W.3d 897, 899 n.1 (Tex. App.-Dallas 2006), aff'd, 52 Tex. Sup. J. 1042,
2009 Tex. LEXIS 470 (Tex. July 3, 2009).
38. See, e.g., Fletcher v. Dep't of Family & Protective Servs., 277 S.W.3d 58, 64 (Tex. App.-Houston
2009, no pet.) (acknowledging that appellant did not file a statement of points, but finding that appellant
satisfied the necessary requirements through his motion for new trial); In the Interest of Z.J.C., No. 10-09-00026-CV, 2009 Tex. App. LEXIS 5628, at *3 (Tex. App.-Waco July 22, 2009, no pet. h.) ("Although not
labeled as a statement of points, S.T. presented specific issues for review in her timely filed motion for new
trial."). 
39. See generally Tex. Fam. Code Ann. § 263.405(i) ("The appellate court may not consider any issue
that was not specifically presented to the trial court in a timely filed statement of the points on which the party
intends to appeal or in a statement combined with a motion for new trial.").
40. See Tex. R. App. P. 47.1. We note that in In re J.O.A., the Texas Supreme Court recently held that
(1) an ineffective assistance of counsel claim can be raised on appeal despite the failure to include it in a
statement of points, and (2) section 263.405(i) is unconstitutional as applied when it precludes a parent from
raising a meritorious complaint about the sufficiency of evidence supporting a termination order. In re J.O.A.,
283 S.W.3d at 339. 
41. Holick, 685 S.W.2d at 20.
42. In re J.L., 163 S.W.3d 79, 84 (Tex. 2005); In re D.S.P., 210 S.W.3d 776, 778 (Tex. App.-Corpus
Christi 2006, no pet.).
43. In re G.M., 596 S.W.2d 846, 847 (Tex. 1980); In re C.S., 208 S.W.3d 77, 83 (Tex. App.-Fort Worth
2006, pet. denied).
44. Tex. Fam. Code Ann. § 101.007 (Vernon 2008).
45. Id. § 161.001(1)-(2).
46. Id. § 161.001(1)(D), (E).
47. Id. § 161.001(2).
48. 96 S.W.3d 256, 266-67 (Tex. 2002) (footnotes and internal quotations omitted).
49. Anastasia Gonzales, a CPS investigator, would later provide testimony on this matter. According
to Gonzales's testimony, T.J.H. told her that Mary applied sutures to his head after he cut it by running into
a glass bowl.
50. Smith gave additional testimony about the time he physically restrained T.J.H. for nearly two hours,
stating:


 There was one time when something had happened, and it was around the time
when he had been told he was going to be put out in the [park] or something, he was so
angry that he had hit some kids and we couldn't get ahold of anybody. I sat in a chair . . . . 
And I held him the way you're supposed to hold them. And I would try to let him go and I'd
say, "[T.J.H.], I just want to let you go. Will you just sit there 'til someone gets here?"

 

 And he'd, [sic] "No, I won't. I'm going to run away." And a couple of times that I tried
to let him go while I had somebody at the doorway and he went running for the door.
51. See generally 40 Tex. Admin. Code § 700.511 (2004) (listing and defining the various dispositions
that the Department's caseworkers may make regarding an investigation).
52. Emphasis in original.
53. Tex. Fam. Code Ann. § 161.001(1)(E).
54. See Tex. Dep't of Human Servs. v. Boyd, 727 S.W.2d 531, 533 (Tex. 1987).
55. Id.
56. Castaneda v. Tex. Dep't of Protective & Regulatory Servs., 148 S.W.3d 509,522 (Tex. App.-El
Paso 2004, pet. denied).
57. Id.
58. Id.
59. Id.
60. A finding of parental conduct endangering a child may also be based on the parent's conduct with
regard to the child's siblings prior to the child's birth. See, e.g., Dallas County Child Protective Servs. Unit v.
Bowling, 833 S.W.2d 730, 733-34 (Tex. App.-Dallas 1992, no writ) (determining that sexual abuse of oldest
son before birth of child in question was evidence of course of conduct that endangered younger child).
61. Mary's failure to provide T.J.H. with counseling services that were readily available to him is
arguably the most emotionally endangering conduct in which Mary engaged. In In re M.C., the Texas
Supreme Court recognized that physical neglect is just as dangerous as direct physical abuse. In re M.C.,
917 S.W.2d 268, 269-70 (Tex. 1996). In the instant case, we are presented with a case of emotional neglect,
which we believe can be just as dangerous as direct emotional abuse. Mary emotionally neglected T.J.H.
when she failed to place him in counseling. The evidence showed that Mary was aware, prior to T.J.H.'s
removal, of the sexual abuse he had endured by Bob. One can easily infer that this abuse has had a
damaging impact on T.J.H.'s emotional well-being. Moreover, Smith and Sublett both informed Mary that
T.J.H. needed counseling; they put her on notice that T.J.H. demonstrated the behavioral inability to act as
children his age traditionally act. Though Mary may not be responsible for inflicting the more serious injuries
to T.J.H.'s emotional well-being (e.g., injuries stemming from Bob's sexual abuse), she is responsible for
failing to take the appropriate measures to heal those injuries.
62. See In re J.O.A., 283 S.W.3d at 346. 
63. Wiley v. Spratlan, 543 S.W.2d 349, 352 (Tex. 1976).
64. Holley v. Adams, 544 S.W.2d 367, 372 (Tex. 1976).
65. Id.
66. Id.
67. Id.
68. In re M.S., 115 S.W.3d 534, 544 (Tex. 2003).
69. In re H.R.M., 209 S.W.3d 105, 111 (Tex. 2006); In re M.S., 115 S.W.3d at 545.
70. Strickland v. Washington, 466 U.S.668, 687-88, 694 (1984).
71. In re M.S., 115 S.W.3d at 545.
72. Id.
73. Id.
74. In re K.K., 180 S.W.3d 681, 685 (Tex. App.-Waco 2005, no pet.).
75. See id.
76. Gibbs v. State, 7 S.W.3d 175, 179 (Tex. App.-Houston [1st Dist.] 1999, pet. ref'd).
77. Howard v. State, 894 S.W.2d 104, 107 (Tex. App.-Beaumont 1995, pet. ref'd).